Smith v. Hollis                        CV-96-501-JD  06/26/97
            UNITED STATES DISTRICT COURT FOR THE
                  DISTRICT OF NEW HAMPSHIRE


Marc A. Smith, et al.

     v.                              Civil No. 96-501-JD

The Town of Hollis, et al.


                         O R D E R


     The plaintiffs, Marc A. Smith and Michael D. Snell, brought

this action under 42 U.S.C. § 1983 against the defendants, the

Town of Hollis, the Hollis Police Department, Chief Richard

Darling, Officer Edward Hummel, Officer Steve Desilets, and

Officer Mathew Judge, in their individual and official

capacities, alleging that the defendants violated the plaintiffs'

constitutional rights to due process of law under the Fourteenth

Amendment, and also asserting supplemental state law claims.

Before the court is the defendants' Rule 12 motion (document no.

7).


                       Background[1]

     In approximately 1988, Marc Smith purchased property at

47 1/2 Flint Pond Drive in Hollis, New Hampshire.  Although he

did not openly reveal his homosexuality, his neighbors became

_____

     [1]The facts relevant to the instant motion are either not in
dispute or have been alleged by the plaintiff.

aware of his sexual orientation through Smith's association with gays and lesbians in the community. On or about September 9, 1991, two neighbors argued that one of them had blocked a common driveway. Smith was not involved in the altercation, but as he left his home, one of the parties involved in the argument shouted verbal epithets at him. As the verbal harassment escalated, Smith contacted the Hollis Police Department (the "police department") to control the situation. However, the police department failed to dispatch an officer to the scene.

On or about September 23, 1991, Smith discovered that a portion of his fence had been torn down. Smith twice contacted the police department, but it never responded to Smith's report of vandalism to his fence. Approximately five days later, after repairing the fence, Smith found his fence torn down again. An officer was dispatched to the scene but did not issue a police report.

On or about October 7, 1991, Smith noticed a neighbor hunting geese on the pond behind his home and became concerned for his personal safety. He contacted the police department but was told that an individual is free to use a firearm for hunting purposes once the person is on the pond, even though the pond may abut residential dwellings. Two days later, Smith found his fence vandalized. An officer was dispatched to his home but

2

again issued no police report.

On or about June 9, 1992, Smith and Michael Snell began living together at Smith's Flint Pond Drive home. On October 29, 1992, they noticed a sexually explicit bumper sticker on their vehicle. After removing it, they called the police department. Officers Hummel and Desilets arrived at the plaintiffs' home, but did not take any fingerprints, did not investigate the matter, did not allow the plaintiff to press charges, and left the plaintiffs' home with the bumper sticker, never to be returned.

On December 26, 1992, while the plaintiffs were on vacation, their house was ransacked and the words "GAY" and "FAG" were painted on their sliding glass doors. A friend who was taking care of the house phoned the police department, but it refused to fingerprint, take photographs, or investigate any portion of the crime scene.

On approximately January 9, 1993, the plaintiffs witnessed their neighbor's teenaged children break the windshield of one of the plaintiffs' vehicles, throw eggs at one of their vehicles, and destroy a portion of their garage. The plaintiffs immediately contacted the police department, but their concerns were dismissed and they were denied an opportunity to press charges against the youths.

At some point the police department summoned Smith to the

3

police station. However, when Smith arrived at the station, Officer Hummel stated that he had forgotten why he had asked Smith to come to the station and belittled Smith's homosexual status. Officer Desilets, who was also present, told Smith that he hated gays.

The plaintiffs subsequently decided to sell their house and contacted Nancy Heline, a DeWolfe Simonds real estate agent. On June 14, 1994, Heline hosted an open house during which approximately $85,000 in jewelry was stolen. The plaintiffs contacted the police department and Officer Ux took the initial incident report, which was approved by Chief Darling. About six weeks later, Hummel returned to the plaintiffs' home, apologized for the lack of investigation, and completed an investigation report. However, Hummel told the plaintiffs that he would not let them pursue charges against DeWolfe Simonds for blocking an investigation, despite the allegation that DeWolfe Simonds had informed the police department that the plaintiffs had moved. Hummel and Desilets later denied that any initial report had been filed.

On August 4, 1994, the plaintiffs noticed Carolyn Anderson, a manager at DeWolfe Simonds, taking pictures of them while they were in their hot tub. The plaintiffs contacted Hummel, but he would not accept a formal charge against Anderson for trespass or

4

invasion of privacy.

On August 6, 1994, after the plaintiffs had made several requests to Hummel for information on the investigation of the burglary of their home, Hummel and Desilets telephoned the plaintiffs at 2 a.m. to give them an update on the investigation and to tell them that Anderson had been on the property to remarket it. The plaintiffs neither expected nor gave authority to the police to call at such an hour. Hummel responded to the plaintiffs' subsequent complaints about the timing of the phone call by informing them that if he were to undertake to harass them, he "would make them sorry."

Darling and the police department began surveillance of the plaintiffs in early August of 1994, noting the type of vehicles the plaintiffs drove and whether the plaintiffs were home. In a deposition in connection with another matter, Hummel stated that surveillance of the victims' home was not normal procedure, was not part of the burglary investigation, and had probably been ordered by Darling.

On August 29, 1994, Officer Judge pulled Snell over for following the vehicle in front of him too closely and issued him a ticket. Because Smith's name was on the registration of the car, Judge also accused Snell of using an alias. Approximately three weeks later, Judge stopped Snell again and, although he

5

issued no ticket, stated to Snell, "I am watching you."

In the officers' subsequent visits to the plaintiffs' home, the parties became increasingly hostile toward one another regarding the treatment the plaintiffs had received from Hummel and Desilets. On one occasion Desilets informed the plaintiffs that he "would not be held responsible for anything that might happen to [them]."

On October 7, 1996, the plaintiffs filed an action pursuant to 42 U.S.C. § 1983 against the defendants for violating the Due Process Clause of the Fourteenth Amendment to the United States Constitution,[2] and asserting various state law claims.[3]


## Discussion

In their complaint, the plaintiffs allege that the defendants violated their due process rights by engaging in a municipal policy of deliberate indifference to the plaintiffs'

---

[2]The claim invokes the substantive rather than the procedural component of the Due Process Clause. See DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 195 (1989).

[3]The plaintiffs allege negligence, intentional and negligent infliction of emotional distress, intentional intrusion upon seclusion, negligent supervision, and breach of fiduciary duty, and also assert respondeat superior liability against the Town of Hollis.

6

loss of real and personal property, a municipal policy of failing to formulate a policy against sexual orientation harassment and of providing inadequate sensitivity training regarding sexual orientation, a municipal policy of failing to respond to repeated complaints, and a municipal policy of not reprimanding or discharging police officers for repeated constitutional violations.

The defendants contend, <u>inter alia</u>, that the plaintiffs' claims are not cognizable under the Due Process Clause because the defendants owed no duty to protect the plaintiffs from private violence. The plaintiffs claim that the defendants assisted in creating an atmosphere of hostility, danger, and deliberate indifference toward the rights of the plaintiffs by failing to safeguard the plaintiffs' persons and property, thus implicating their constitutional right to due process.

The defendants have moved to dismiss the plaintiffs' complaint for failure to state a claim upon which relief can be granted and for judgment on the pleadings. Because the defendants have filed an answer to the plaintiffs' complaint, the pleadings have closed under Fed. R. Civ. P. 7(a), and as such, the court will treat the defendants' entire motion as a motion for judgment on the pleadings. <u>See</u> Fed. R. Civ. P. 12(c).

The standard for evaluating a Rule 12(c) motion for judgment

on the pleadings is essentially the same as the standard for evaluating a Rule 12(b)(6) motion.  See Republic Steel Corp. v. Pennsylvania Eng'g Corp., 785 F.2d 174, 182 (7th Cir. 1986).  In both cases, the court's inquiry is a limited one, focusing not on "whether a plaintiff will ultimately prevail but whether [he or she] is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (motion to dismiss under Fed. R. Civ. P. 12(b)(6)).  In making its inquiry, the court must accept all factual averments contained in the complaint as true, and draw every reasonable inference in favor of the plaintiffs.  See Garita Hotel Ltd. Partnership v. Ponce Fed. Bank, 958 F.2d 15, 17 (1st Cir. 1992) (Rule 12(b)(6) motion); Santiago de Castro v. Morales Medina, 943 F.2d 129, 130 (1st Cir. 1991) (Rule 12(c) motion).  Great specificity is not required to survive a Rule 12 motion.  "[I]t is enough for a plaintiff to sketch an actionable claim by means of 'a generalized statement of facts.'"  Garita, 958 F.2d at 17 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (1990)).  In the end, the court may not enter judgment on the pleadings unless it appears "'beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief.'" Santiago de Castro, 943 F.2d at 130 (quoting Conley v. Gibson,

8

355 U.S. 41, 45-46 (1957)); <u>see also</u> <u>Rivera-Gomez v. de Castro</u>, 843 F.2d 631, 636 (1st Cir. 1988).

There are two elements of a claim brought under 42 U.S.C. § 1983. First, "the challenged conduct must be attributable to a person acting under color of state law," and second, "the conduct must have worked a denial of rights secured by the Constitution or by federal law." <u>Soto v. Flores</u>, 103 F.3d 1056, 1061 (1st Cir. 1997) (citing <u>Martinez v. Colon</u>, 54 F.3d 980, 984 (1st Cir.), <u>cert. denied</u>, 115 S. Ct. 515 (1995)). Because it is undisputed that the named defendants were acting under color of state law, the court proceeds to the question of whether their conduct resulted in a violation of the plaintiffs' federally protected rights.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State . . . shall deprive any person of life, liberty, or property, without due process of law." However, it is well settled that not every negligent or reckless act committed by a state actor is a constitutional violation. <u>See, e.g.</u>, <u>Soto</u>, 103 F.3d at 1064. Not every failure on the part of a public official to perform official duties properly and responsibly provides the basis for a 1983 action. Rather, a plaintiff bringing a substantive due process claim either must demonstrate (1) the deprivation of an

9

identifiable liberty or property interest protected by the Due Process Clause of the Fourteenth Amendment; or (2) governmental conduct that "shocks the conscience."  See Frances-Colon v. Ramirez, 107 F.3d 62, 63 (1st Cir. 1997); Brown v. Hot, Sexy & Safer Prods., Inc., 68 F.3d 525, 531 (1st Cir. 1995), cert. denied, 116 S. Ct. 1044 (1996); Pittsley v. Warish, 927 F.2d 3, 6 (1st Cir. 1991).  The court considers the plaintiffs' allegations under both theories.

A.   Deprivation of a Protected Interest

The Due Process Clause confers no affirmative right to government aid, even to secure an individual's life, liberty, or property interests.  See DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 196 (1989).  In DeShaney, the Supreme Court held that

> nothing in the language of the Due Process Clause
> itself requires the State to protect the life, liberty,
> and property of its citizens against invasion by
> private actors.  The Clause is phrased as a limitation
> on the State's power to act, not as a guarantee of
> certain minimal levels of safety and security.  It
> forbids the State itself to deprive the individuals of
> life, liberty, or property without "due process of
> law," but its language cannot fairly be extended to
> impose an affirmative obligation on the State to ensure
> that those interests do not come to harm through other
> means.

Id. at 195.  The court concluded that, "[a]s a general matter

10

. . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." Id. at 197.

However, there are two recognized instances where the Constitution imposes affirmative duties of care and protection upon the State. First, when the state affirmatively exercises its power to restrain an individual against his will so that he cannot properly care for or protect himself, "the Constitution imposes upon [the state] a corresponding duty to assume some responsibility for his safety and general well-being." Id. at 200; see also Youngberg v. Romeo, 457 U.S. 307, 315-25 (1982) (state deprives "historic liberty interest" in personal security by failing to provide safe conditions for involuntarily committed mental patients); cf. Estelle v. Gamble, 429 U.S. 97, 103-04 (1976) (Eighth Amendment requires state to provide adequate medical care to incarcerated prisoners). Second, a plaintiff may bring a due process claim when "[a] government employee, in the rare and exceptional case, affirmatively acts to increase the threat of harm to the claimant or affirmatively prevents the individual from receiving assistance." Frances-Colon, 107 F.3d at 63-64 (citing Dwares v. New York, 985 F.2d 94, 96 (2d Cir. 1993) and Ross v. United States, 910 F.2d 1422, 1429-34 (7th Cir. 1990)). Where, as here, the plaintiffs' claims do not arise from

11

being placed into custody by the state, the relevant inquiry is whether the state has "affirmatively acted" to increase the threat of harm to the plaintiffs or to prevent the plaintiffs from receiving assistance so that a corresponding constitutional duty to protect the individuals is imposed on the state. Cf. DeShaney, 489 U.S. at 200.

In Dwares, the plaintiff alleged that police officers conspired with or agreed to permit "skinheads" to harass and assault the plaintiff and other persons who, as part of a demonstration, were burning the American flag. See 985 F.2d at 97. The Dwares court interpreted DeShaney

> to imply that, though an allegation simply that police officers had failed to act upon reports of past violence would not implicate a victim's rights under the Due Process Clause, an allegation that the officers in some way had assisted in creating or increasing danger to the victim would indeed implicate those rights.

Id. at 99. Noting that the plaintiff's claim asserted that the defendants had made the demonstrators more vulnerable to assault, the court found that the plaintiff had stated a claim for due process violation. See id.; see also Wood v. Ostrander, 879 F.2d 583, 589-90 (9th Cir. 1989) (finding protected liberty interest where woman was raped after police impounded her vehicle and left her stranded in high-crime area at 2:30 a.m.).

Here, the plaintiffs attempt to distinguish their claim from

12

DeShaney, claiming that the police department did not simply fail to act on the plaintiffs' complaints, but rather "assisted in creating an atmosphere of hostility, danger and deliberate indifference towards the plaintiffs . . . thus implicating their due process rights."  Pls.' Objection to Defs.' Mot. to Dismiss at 24.  However, the plaintiffs' complaint -- which alleges, inter alia, that the police failed to respond to plaintiffs' repeated complaints, failed to investigate the offensive bumper stickers, failed to allow plaintiffs to press charges, and failed to investigate burglary and vandalism -- belies this assertion.  Rather than establishing that the defendants took affirmative steps to create increase the threat of harm to the plaintiffs or to prevent them from receiving assistance, the plaintiffs' assertions amount to nothing more than allegations that the police officers stood idly by and did nothing in response to the plaintiffs' complaints.  As in DeShaney, the facts of the instant case indicate that the police "played no part in [creating danger to the plaintiffs], nor did . . . anything to render [them] any more vulnerable to [the danger]. . . . [The police department] placed [the plaintiffs] in no worse position than that in which [the plaintiffs] would have been had it not acted at all."  489 U.S. at 201; see also Soto, 103 F.3d at 1063 (due process claim based on failure to protect fails to state claim on which relief

13

can be granted).  In addition, notwithstanding their allegation that the individual and municipal defendants created an "atmosphere of hostility," the plaintiffs have failed to allege any demonstrable nexus between the acts of the defendants and the harassment perpetrated on the plaintiffs.  See Dwares, 985 F.2d at 97 (complaint alleges that police conspired with and told skinheads that they could assault flag-burners without fear of police intervention).  Accordingly, the plaintiffs' assertion that the defendants deprived them of a liberty interest by affirmatively increasing the threat of harm to them must fail.[4]

B.  Conscience-Shocking Behavior

Having determined that the plaintiffs have not demonstrated that the defendants affirmatively acted to violate the plaintiffs' liberty and property interests under the Due Process Clause, the court turns to the second theory under which a plaintiff could conceivably demonstrate a due process violation, and considers whether the individual and municipal defendants

_____

[4]To the extent the plaintiffs claim that the affirmative acts alleged in the complaint -- i.e., ticketing Snell, pulling him over twice, stating "I am watching you," and otherwise threatening and harassing them -- constitute the deprivation of a liberty interest, this claim is without merit.  See Pittsley, 927 F.2d at 7 ("Fear or emotional injury which results solely from verbal harassment or idle threats is generally not sufficient to constitute an invasion of an identified liberty interest.").

14

engaged in conduct that shocks the conscience.  In <u>Rochin v.</u>
<u>California</u>, the Supreme Court held that the government's acts of,
<u>inter alia</u>, pumping an individual's stomach in order to obtain
evidence "shock[ed] the conscience" and offended even "hardened
sensibilities," and therefore constituted a violation of the Due
Process Clause.  <u>See</u> 342 U.S. 165, 172 (1952).  The First Circuit
has found conscience-shocking conduct to occur only when state
actors have engaged in "extreme or intrusive physical conduct."
<u>Brown</u>, 68 F.3d at 531 (quotation marks omitted) (quoting <u>Souza v.</u>
<u>Pina</u>, 53 F.3d 423, 427 (1st Cir. 1995)); <u>see, e.g.</u>, <u>Harrington v.</u>
<u>Almy</u>, 977 F.2d 37, 43-44 (1st Cir. 1992) (reasonable finder of
fact could find conscience-shocking behavior where police officer
charged with child sex abuse was required to take penile
plethysmograph, measuring sexual arousal in response to sexually
explicit material, as condition of reinstatement).  In the
instant case, the acts of ticketing Snell, pulling him over
twice, stating "I am watching you," and otherwise threatening and
harassing the plaintiffs clearly do not rise to the level of
conscience-shocking behavior.  <u>See</u> <u>Brown</u>, 68 F.3d at 532 (to
constitute conscience-shocking behavior, words or verbal
harassment must meet high threshold); <u>see also</u> <u>Pittsley</u>, 927 F.2d
at 7 ("[A] single threat made by [police] officers is not
sufficient to 'shock the conscience.'").  In addition, the court

15

will not permit the plaintiffs to make an end run around <u>DeShaney</u> by asserting that the police's failure to protect them shocks the conscience.  <u>See</u> <u>DeShaney</u>, 489 U.S. at 195 (Due Process Clause places no affirmative burden on state to guarantee minimal levels of safety).

Conclusion

The plaintiffs' due process claims must be dismissed for the foregoing reasons.[5]  While some of the allegations concerning police conduct in this case, if true, demonstrate a serious dereliction of duty on the part of the officers involved, under

---

[5]The court notes that a plaintiff may state a cause of action under the Equal Protection Clause of the Fourteenth Amendment by asserting that the police failed to provide protection to them based on their membership in a particular class.  <u>See, e.g.</u>, <u>Soto</u>, 103 F.3d at 1066 (analyzing equal protection claim brought by domestic violence victim); <u>cf.</u> <u>Tester v. New York</u>, No. 95 Civ. 7972(LMM), 1997 WL 81662, at *5 (S.D.N.Y. Feb. 25, 1997) (police department practice of harassing and treating differently homosexual officers, though not entitled to strict scrutiny, must still bear rational relationship to some legitimate end).  However, while alleging that the defendants maintained a policy of inadequate sensitivity training regarding sexual orientation and failed to formulate a policy against sexual orientation harassment, the plaintiffs have not alleged that the defendants declined to provide them with police protection on account of their sexual orientation.  While a motion for judgment on the pleadings should not be granted if there is some recognized theory on which relief could be accorded, the court will not insert into the record factual assertions that the plaintiffs have not only not alleged, but that are conspicuously absent from their 46-page complaint.

existing case law the complaint does not set forth a sufficient basis for a 1983 action.  The court grants the defendants' motion for judgment on the pleadings (document no. 7) as to count 1. The court declines to exercise jurisdiction over the plaintiffs' claims arising under New Hampshire law.  See 28 U.S.C.A. § 1367(c) (West 1993).  The clerk is ordered to close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
Chief Judge

June 26, 1997

cc:  Mary Notaris, Esquire
     Lawrence S. Smith, Esquire